UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NGOC THANH PHONG HUYNH,<br>*Petitioner,*<br><br>v.<br><br>ANTONE MONIZ, Superintendent, PATRICIA HYDE, Field Office Director, TODD LYONS, Acting Director U.S. Immigration and Customs Enforcement, KRISTI NOEM, U.S. Secretary of Homeland Security, PAM BONDI, U.S. Attorney General,<br>*Respondents.* | Docket No. 1:25-cv-10831-FDS<br><br><br><br><br>**PETITION FOR WRIT OF HABEAS CORPUS** |

**RESPONSE TO RESPONDENTS' OPPOSITION TO PETITIONER'S
PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241**

The irregular application of federal immigration law has placed Petitioner Phong Huynh in a horrifying position—separated from his daughters who he is raising as a single dad and facing lengthy mandatory immigration detention for a 2006 state-court criminal matter that the government has heretofore ignored, with no opportunity for release pending disposition of his immigration case. Such detention violates Mr. Huynh's due-process rights. He respectfully submits this memorandum to assist the Court in understanding how mandatory detention under 8 U.S.C. § 1225(b)(2)(A), as applied to Mr. Huynh, violates his rights under the Fifth Amendment.

## INTRODUCTION

The government does not dispute any of the facts alleged in the petition. The government does not dispute that Mr. Huynh is 37 years old and has been a lawful permanent resident of the United States for roughly 25 years. Am. Pet. ¶ 3. The government does not dispute that Mr. Huynh works making individualized medicines for the treatment of cancer, and that he is a caregiver for his two U.S. citizen daughters. *Id.* ¶ 2. It does not dispute that Mr. Huynh has never been charged

with any crime as an adult. *Id.* ¶ 6. The government agrees that it arrested Mr. Huynh at Logan Airport upon his return from a vacation. *Id.* ¶ 8. The government agrees that the sole justification for that detention is two misdemeanor charges from roughly 20 years ago—when Mr. Huynh was 17—involving property under $250, both of which were continued without a finding and later dismissed. *Id.* ¶¶ 15-17. The government does not dispute that it has been aware of those charges since around 2007 or 2008, and that it nevertheless renewed Mr. Huynh's green card multiple times and allowed him to travel in and out of the United States without incident on multiple occasions. *Id.* ¶¶ 18-19.

The government also does not dispute that Mr. Huynh presents neither a flight risk nor a danger—indeed, the government does not point to any evidence whatsoever that Mr. Huynh is dangerous or might flee, nor does it identify any other government interest in detaining him in light of the facts and circumstances of his case. *See generally* Gov't Opp. The government agrees that Mr. Huynh has received no bond hearing to determine if his detention will continue, and that he will never receive such a hearing absent order from this Court. *Id.* at 4-6. The government agrees it had authority to release Mr. Huynh on parole, but it didn't do that. *Id.* at 11. Mr. Huyhn is jailed at the Plymouth County Correctional Facility. Am. Pet. ¶ 20. And the government does not dispute that, absent intervention of this Court, Mr. Huynh's incarceration will continue throughout a lengthy process in the immigration court. *Id.* ¶ 21. Even now, more than two weeks after his arrest, Mr. Huynh has still never been brought before an immigration judge, and there is no dispute that he is likely to wait two to three months more just to get to his first hearing on the merits. *Id.* ¶¶ 23-24; *See* Freidel Decl. ¶¶ 7–8. Every day Mr. Huynh is in jail, he is deprived of his liberty, he is separated from his children, and he is physically prevented from manufacturing individualized medicines that may save the lives of cancer patients.

Because none of the facts are in dispute, and there is no challenge to jurisdiction or venue, the issue before the Court is a pure question of law—an as-applied constitutional challenge to the operation of mandatory detention under 8 U.S.C. § 1225(b) on the facts of this case. The government contends that it must detain Mr. Huynh under this statute without any bond hearing, even though it has not and cannot articulate any reason why such detention is necessary. But the Constitution requires more. As described below, civil immigration detention may generally be a part of the immigration system, but the Supreme Court has made crystal clear that such detention cannot exist purely for its own sake, untethered from the government interests it purports to serve. Rather, due process requires that immigration detention advance government interests such as preventing flight and protecting the community from danger pending resolution of the immigration process. Nobody suggests that Mr. Huynh's detention serves those purposes, and the government has not provided him with any hearing on these issues and never will.

As a returning permanent resident who has made his life in the United States, Mr. Huynh is entitled to due process. Unless this Court acts, his rights will be denied. For all the reasons further described below, the Court should order Mr. Huynh's release on such conditions it deems proper, or alternatively order him to be released unless the immigration court conducts a bond hearing with appropriate procedural protections for Mr. Huyhn's constitutional right against the unjustified and arbitrary deprivation of his liberty.

## **BACKGROUND**

In its opposition to Mr. Huynh's amended petition, Respondents do not dispute the facts that Mr. Huynh pleaded in the amended petition. For the Court's convenience, Mr. Huynh briefly recounts the relevant facts here, supplemented with facts from his supporting declaration.

I. **Mr. Huynh's personal history, circumstances, employment, and education.**

Mr. Huynh was born in Vietnam in 1988, and he immigrated to the United States with his family in 2000, arriving on or around December 20, 2000. Decl. ¶ 2. He became a legal permanent resident on December 21, 2000. *Id.* Since then, he has called the United States home. *Id.*

Mr. Huynh is a single father of two daughters, aged 14 and 15, both of whom are U.S. citizens. Decl. ¶ 4. They live in Braintree in a single-family home with Mr. Huynh's father and mother. *Id.* Mr. Huynh's parents have limited English-language abilities, and Mr. Huynh is their only child. *Id.* Mr. Huynh is the primary caregiver for his daughters. *Id.*

Mr. Huynh earned a bachelor of science degree from Northeastern University, and he is currently pursuing a master's degree part-time, also from Northeastern University. Decl. ¶ 6. He is one lab away from completing the coursework for the master's degree. *Id.*

Mr. Huynh works at a pharmaceutical company as a senior manufacturing associate (lead). Decl. ¶ 5. He works in one of the company's Individualized Neoantigen Therapies (INT) teams to make lung-cancer medicine for individual patients. *Id.* INT medicines are made by analyzing the unique pattern of genetic mutations present in an individual patient's cancer, and then preparing a medication targeted at those specific mutations. The medications essentially show the patient's immune system the specific "fingerprint" of the patient's disease, which allows the immune system to recognize and fight the cancer. *Id.*

Since his detention, Mr. Huynh has been unable to care and provide for his daughters or his elderly parents. Decl. ¶ 21. He has been unable to return to work creating anti-cancer treatments. *Id.* And as set forth in Mr. Huynh's declaration (filed under seal), his detention is also compromising certain compelling family interests. *See* Decl. ¶ 23.

## II. Mr. Huynh's criminal history.

When Mr. Huynh was 17 years old, Braintree police filed an application for a criminal complaint against him, charging him with misdemeanor larceny and misdemeanor receiving stolen property. *See* Decl. ¶ 7. According to the docket of that case, the matter was continued without a finding and then dismissed.

Mr. Huynh thereafter became an adult and built his life in the United States, attending Northeastern University, fathering his two daughters, and obtaining important employment creating anti-cancer treatments.

## III. Mr. Huynh's immigration and travel history.

Mr. Huynh applied to become a U.S. citizen, completing a detailed naturalization application that he submitted to the U.S. Citizenship and Immigration Services (USCIS), in 2007 or 2008, at which point his misdemeanors came to the attention of USCIS, who could have issued a Notice to Appear. Decl. ¶ 14. Although his application was denied on the basis of the Quincy District Court case, the immigration authorities did not seek to detain or remove him. *See id.* He also applied to renew his LPR card, again completing a form and bringing himself to the attention of the immigration authorities, without issue. *See* Decl. ¶ 2. Mr. Huynh has traveled in and out of the United States multiple times, including after the disposition of the Quincy District Court case, again without issue. Decl. ¶ 15. For example, between 2006 and 2024, he has flown to and back from Vietnam and entered the United States with his green card without issue. Decl. ¶ 16.

Recently, Mr. Huynh went on a trip to Vietnam with some coworkers. Decl. ¶ 17. They left for Vietnam on or about March 18, 2025, and returned to the United States on April 1. *Id.* ¶ 18.

They arrived in Boston on the morning of April 1, 2025. Decl. ¶ 19. At the CBP counter, Mr. Huynh provided his Vietnamese passport and U.S. green card and had his fingerprints scanned. *Id.* After reviewing Mr. Huynh's information, the CBP officer called for another CBP officer to escort

Mr. Huynh to a large waiting room so that they could "verify" his information. *Id.* Mr. Huynh was then transferred into a holding cell. *Id.* He was held in the cell overnight and into the next evening, when he was transported to the Plymouth County Correctional Facility at or around 9 PM on April 2, 2025. *Id.*

At no time before Mr. Huynh's arrival at the Plymouth County Correctional Facility was Mr. Huynh offered or given anything to eat. Decl. ¶ 20. Someone whom Mr. Huynh believed to be a CBP officer gave him a bottle of water. *Id.*

At no time during Mr. Huynh's detention did CBP explain to him the exact reason for his detention. Decl. ¶ 21. It was only on April 7, 2025—after the U.S. Attorney's Office had given undersigned counsel a copy of a DHS Notice to Appear following the filing of the habeas petition—that Mr. Huynh learned that DHS intended to deport him from the United States because he had committed a crime involving moral turpitude in 2006. *Id.*

## ARGUMENT

The government in this case does not dispute that this Court has jurisdiction, and does not argue that Mr. Huynh is a danger or flight risk. Even so, the government does not offer to release Mr. Huynh. Instead, it acknowledges what Mr. Huynh pleaded in his amended petition—that he is a mandatory detainee, with no opportunity to seek release or a bond hearing pending adjudication of his immigration case.

Such a result cannot be constitutional in Mr. Huynh's case. As explained below, because Mr. Huynh is a long-term permanent resident returning from a brief trip abroad, he is entitled to a detention hearing that the INA deprives him of. His status grants him due-process rights that other arriving aliens may not have, and those due-process rights require a hearing on whether his detention is appropriate pending resolution of his immigration case. Furthermore, the government's nearly twenty-year delay in pursuing Mr. Huynh's removal—reflecting its lack of

interest in doing so upon which Mr. Huynh relied in building his adult life in the United States—also violates his due-process rights. His lack of a presumptively unbailable "aggravated felony" conviction further underscores that his categorical mandatory detention is unconstitutional. The Court should therefore order Mr. Huynh's release.

I. **Even though Mr. Huynh is an "arriving alien" under the INA, his status as a long-standing legal permanent resident returning from a brief trip abroad grants him the same due-process protections as a continuously residing permanent resident.**

For the purposes of due process protections, the Supreme Court has held that a returning LPR like Mr. Huynh is no different than a continuously residing LPR. *Landon v. Plasencia*, 459 U.S. 21, 31-32 (1982); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 595-96 (1953). For purposes of constitutional analysis, he is certainly not an arriving asylum-seeker or an initial applicant for admission. Thus it is not the label on his Notice to Appear that controls for the due process analysis; rather, what matters is his status as a long-term permanent resident who went on a brief trip abroad. Due process not only protects him from prolonged mandatory detention; it also protects him from any unconstitutional deprivation of his liberty.

As a long-standing LPR returning from a brief trip abroad, Mr. Huynh is entitled to the same constitutional protections as a continuously residing LPR. Although *Plasencia* permits Mr. Huynh to be named an "arriving alien"[1] under the INA, Mr. Huynh's constitutional right to due process remains unchanged. *See* 459 U.S. at 31-32 (holding that a returning LPR may be placed in exclusion proceedings, but "she can invoke the Due Process Clause on returning to this country").

---

[1] Mr. Huynh does not make any constitutional claims regarding the government's decision to charge him under 8 U.S.C. § 1182 instead of § 1227. As such, the First Circuit's holding in *Mejia-Rodriguez v. Holder* is inapposite. 558 F.3d 46, 49-50 (1st Cir. 2009) (rejecting equal protection argument for returning LPR because congressional decision to charge under grounds of inadmissibility passed rational basis review). Mr. Huynh's argument centers on his due-process right to be free from detention without a hearing about the necessity of detention, which the petitioner in *Mejia-Rodriguez* did not raise. *See id.* at 49 n.3 ("Mejia–Rodriguez describes his claim in terms of due process, but it is more fairly characterized as an equal protection claim.").

For example, in *Plasencia*, which the government cites (*see* Gov't Opp. at 10), the Supreme Court held that due process required a hearing on the exclusion charges for a returning LPR. *Plasencia,* 459 U.S. at 33.[2] Likewise, in *Kwong Hai Chew*, the Supreme Court held that a returning LPR's detention without a hearing violated his due process rights because of his status as an LPR. 344 U.S. at 595-96. As the Supreme Court succinctly opined: "From a constitutional point of view, [a returning LPR] is entitled to due process without regard to whether or not, for immigration purposes, he is to be treated as an entrant alien." *Id.* at 600. Consequently, the Supreme Court reversed the denial of the petitioner's habeas petition. *Id.*

The holding in *Shaughnessy v. U.S. ex rel. Mezei* is consistent with *Plasencia* and *Kwong Hai Chew*, and the government's reliance on *Mezei* to the contrary is misplaced. *See Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206 (1953). In *Mezei*, a lawful permanent resident abandoned his residency by departing the United States for too long, going "behind the Iron Curtain" for nineteen months, after which the government excluded him for national security reasons. *Id.* at 214. For that reason, the Supreme Court distinguished his case from the lawful permanent resident in *Kwong Hai Chew*, who spent only four months outside of the United States. *Mezei*, 345 U.S. at 213–14. In the Supreme Court's eyes, *Kwong Hai Chew* was "assimilated" for constitutional purposes to the status of a continuously permanent resident; *Mezei*'s departure and length of stay in enemy territory assimilated him, for constitutional purposes, to the status of a noncitizen seeking initial entry. *Mezei*, 345 U.S. at 213-214.

Several district courts have applied *Plasencia*, *Kwong Hai Chew*, and *Mezei* to conclude that returning LPRs detained under 1225(b) are entitled to due process protections. *See, e.g., Arias v. Aviles*, No. 15-CV-9249, 2016 WL 3906738, at *4-8 (S.D.N.Y. July 14, 2016) (applying *Plasencia*, *Kwong Hai Chew*, and *Mezei* to hold that returning LPR charged as "arriving alien" has due-process

---

[2] *Plasencia*'s case did not separately raise whether detention pending exclusion proceedings was constitutional.

rights, and reasoning that "these cases support the conclusion that LPRs like Gutierrez Arias possess the same rights at the border as they do inside it, in spite of their brief absence from the U.S. This Court will thus afford Gutierrez Arias the same due process protections enjoyed by continuously present LPRs"); *Heredia v. Shanahan*, 245 F. Supp. 3d 521, 525-26 (S.D.N.Y. 2017) (following reasoning in *Arias* that there is no reason to distinguish LPR detained under 1225(b) from LPR detained under 1226(c) for due process analysis in prolonged mandatory detention); *Espinal v. Decker*, No. 17 Civ. 3492, 2017 WL 4334004, at *2 (S.D.N.Y. Jun. 30, 2017) (same, and rejecting *Perez v. Aviles*, 188 F. Supp. 3d 328 (S.D.N.Y. 2016) as not "meaningfully consider[ing] relevant Supreme Court jurisprudence"); *Morris v. Decker*, No. 17-CV-02224, 2017 WL 1968314, at *3-4 (S.D.N.Y. May 11, 2017) (same); *Ricketts v. Simonse*, No. 16 Civ. 6662, 2016 U.S. Dist. LEXIS 174751, *5-6 (S.D.N.Y. Dec. 16, 2016) (same); *Chen v. Aitken*, 917 F. Supp. 2d 1013, 1016 (N.D. Cal. 2013) (LPR charged as arriving alien had due process right to bond hearing because of prolonged detention); *Bautista v. Sabol*, 862 F. Supp. 2d 375, 380-81 (M.D. Pa. 2012) (same); *De Ming Wang v. Brophy*, No. 17-CV-6263, 109 U.S. Dist. LEXIS 1826, *5-6 (W.D.N.Y. Jan. 4, 2019) (same). While the petitioners in these cases argued that their due process rights were violated by virtue of their prolonged detention, and did not raise whether any amount of mandatory detention under 1225(b) violated due process, the courts nonetheless held that the Due Process Clause applies to them. Their constitutional protections were the same as those LPRs who had never left.

Applying these principles here, Mr. Huynh's status as an arriving alien does not diminish his due-process rights. The government here does not claim that Mr. Huynh abandoned his U.S. residency—as such, he is like *Kwong Hai Chew*, not *Mezei*. This Court must therefore consider Mr. Huynh's due-process rights as if he were a continuously residing LPR.

Consequently, the government incorrectly relies on cases involving noncitizens seeking initial admission to the United States, such as the Supreme Court's decision in *Dep't of Homeland*

9

*Sec. v. Thuraissigiam*, 591 U.S. 103 (2020), and the First Circuit's decision in *Amanullah v. Nelson*, 811 F.2d 1 (1st Cir. 1987). In *Amanullah*, the First Circuit decided, in the case of noncitizens "seeking initial admission to the United States," that detention pursuant to section 1225(b) did not violate the Due Process Clause because noncitizens seeking initial admission have no due-process rights. 811 F.2d at 8-9, 10 (distinguishing between government action that "keeps a putatively unentitled person from something he never had" and that which "takes from a person...something he theretofore enjoyed"). Similarly in *Thuraissigiam*, the Supreme Court decided, in the case of an illegal entrant who was caught within 100 miles of the land border and under 14 days in the United States, that the expedited removal proceedings did not violate due process because, "[l]ike an alien detained after arriving at a port of entry, an alien like respondent is 'on the threshold.'" 591 U.S. at 140 (quoting *Mezei*, 345 U.S. at 212).

The government cannot claim that Mr. Huynh is, for constitutional purposes, on the threshold of initial entry like the just-arriving asylum-seekers in *Thuraissigiam* and *Amanullah*. Nor is he seeking a visa to enter the United States, like the applicant whose denial of entry the Supreme Court upheld in *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972); *see also U.S. ex. rel Knauff v. Shaughnessy,* 338 U.S. 537, 539, 543 (1950) (rejecting a due-process challenge to a statute denying entry to a first-time applicant). Rather, he is, like *Kwong Hai Chew* and *Plasencia*, a returning LPR whose brief trip abroad entitles him upon return to the same constitutional protections as a continuously residing permanent resident.

**II.     The INA prohibits the immigration court from holding a hearing to determine whether Mr. Huynh's detention is necessary, which violates his due-process rights.**

There is no dispute that the INA provides Mr. Huynh with no right to a hearing to determine whether detention is necessary. Any hearing that the immigration court conducts to determine whether Mr. Huynh is removable will not address in the first instance whether he

10

should be detained pending a final determination of his removal.[3] As the government concedes in its filing, the INA purports to prevent the release of Mr. Huynh: in relevant part, it states that an "applicant for admission detained under 8 U.S.C. § 1225(b)(2)(A) ... is not statutorily entitled to release or to seek a bond hearing while in removal proceedings." Gov't Opp'n at 4, 6–7. A final removal determination can take months or years, even as Mr. Huynh sits in detention, away from his teenage daughters and important work producing anti-cancer drugs, without the government having to prove the necessity of such detention pending proceedings. *See* Freidel Decl. ¶¶ 7–8, 13 (describing length of time that a detainee must wait for a resolution of his removal case in immigration court); *Reid v. Donelan*, 390 F. Supp. 3d 201, 211-212 (D. Mass. 2019), *aff'd in part, vacated in part, remanded by Reid v. Donelan*, 17 F.4th 1, 8 n.7 (1st Cir. 2021) (reporting government statistics that median length of detention for class of 1226(c) detainees was 363 days).

The lack of a mechanism to review Mr. Huynh's mandatory detention violates his due-process rights because Mr. Huynh's due-process rights as an "assimilated" LPR entitle him to an individualized detention determination. *See Plasencia*, 459 U.S. at 33. For example, the Supreme Court in *Kwong Hai Chew* held that a returning LPR's detention without a hearing violated his due process rights. 344 U.S. at 595-96. Because immigration detention is a form of civil confinement, it must serve one or both of two regulatory goals: ensuring appearance at future immigration proceedings, and preventing danger to the community. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). As such, this court should decide, in keeping with *Kwong Hai Chew*, that Mr. Huynh is entitled to a hearing on his detention, and that such a hearing consider at its core how to ensure

---

[3] The government relies on the Fourth Circuit's opinion in *Othi v. Holder*, 734 F.3d 259 (4th Cir. 2013), but that case is inapposite. The petitioner in *Othi* did not challenge detention during the proceedings, but only challenged the procedures in his removal proceedings. *Id.* at 262 ("Othi challenged the removal proceedings on several grounds, but only one—concerning his status as an arriving alien—is raised on appeal. In particular, Othi argued that he was not an arriving alien because he never intended his trip abroad to meaningfully interrupt his permanent residence.").

his appearance at future immigration proceedings and prevent danger to the community. *See Zadvydas*, 533 U.S. at 690.

In arguing against such a hearing, the government misplaces reliance on *Demore v. Kim*, 538 U.S. 510 (2003). In *Demore*, the Supreme Court did not answer the question that Mr. Huynh's case presents: whether mandatory detention under Section 1225(b) is constitutional as applied to him. *See id.* The government here presents no Congressional findings about why categorical mandatory detention should apply. Elsewhere, courts have justified mandatory, categorical detention for those who are initial applicants for admission based on concerns about "leav[ing] an unprotected spot in the Nation's armor." *See Kwong Hai Chew*, 344 U.S. at 602. Yet, Mr. Huynh's case presents no such justification, as he is a long-term permanent resident of the United States, having arrived at the age of twelve and spent his whole adult life in the United States, raising a family and building his career here. Thus, as applied to Mr. Huynh—a long-term lawful permanent resident, returning from a brief trip abroad—mandatory detention under Section 1225(b) is unconstitutional. *See id.* (holding that affording a returning LPR the right to a hearing on his detention "does not leave an unprotected spot in the Nation's armor" because prior to his admission for permanent residence, he satisfied the relevant immigration authorities about his suitability for that status).

The First Circuit already has rejected the government's reliance on the *Demore* court's statement that "when the government deals with deportable aliens, the Due Process Clause does not require it to employ the least burdensome means to accomplish its goal." *Hernandez-Lara v. Lyons*, 10 F.4th 19, 28 (1st Cir. 2021) (quoting *Demore*, 538 U.S. at 526). The First Circuit described this language as an "attempt to downplay" the deprivation of liberty at stake in immigration detention, and reasoned that "the government's exercise of its power to detain immigrants pending removal 'is subject to important constitutional limitations.'" *Id.* (quoting *Zadvydas*, 533

U.S. at 695). The *Hernandez-Lara* court further rejected the government's oversimplified reliance on the *Demore* court's statement that detention is a "constitutionally valid aspect of the deportation process." *See Hernandez-Lara*, 10 F.4th at 28-29 (cleaned up). Holding that a noncitizen's due process rights were violated by bearing the burden of proof in a bond hearing, the First Circuit responded, "[b]ut the same could be said for criminal proceedings. And in either case the fact that some detention is permissible does not change the fact that a detainee suffers significant liberty deprivations." *Id.* As such, the lack of an individualized hearing in Mr. Huynh's case violates due process. This is especially so here, where the government does not even contend that it has any interest in detaining him, or that Mr. Huynh's detention promotes any of the permissible goals of civil detention.

**III.    The government's efforts to detain Mr. Huynh now despite its failure to seek his detention for nearly two decades, despite its knowledge of Mr. Huynh's record and his occasional international travel, also violates his due-process rights.**

Mandatory detention under Section 1225(b) also is unconstitutional as applied to Mr. Huynh because the government did not seek to detain or deport him for years after he was convicted for the pair of misdemeanors two decades ago when Mr. Huyhn was a teenager. In *Demore v. Kim*, Justice Kennedy's concurrence acknowledged that an "unreasonable delay by the INS in pursuing and completing deportation proceedings" could result in a due process violation, even if the INS provisions permitting detention are facially constitutional, *see* 538 U.S. at 540 (Kennedy, J., concurring), and the majority opinion left open as-applied challenges to Section 1226(c). *See Demore*, 538 U.S. at 531; *Perera v. Jennings*, 598 F. Supp. 3d 736, 743-44 (N.D. Cal. 2022) (deciding as-applied challenge to Section 1226(c), which the *Demore* court left open because *Demore* only addressed a facial challenge to the statute). Although silent in regard to as-applied challenges to Section 1225(b) for unreasonable delay, *Demore* is consistent with the permissibility

13

of such challenges, and the application of this principle in Section 1226(c) cases are illustrative. *See Demore*, 538 U.S. at 531.

For example, numerous district courts have held that Section 1226(c), the mandatory detention statute at issue in *Demore*, was unconstitutional as applied to LPRs who resided in the community for some time, where ICE was aware of their deportability but chose not to seek detention and removal proceedings. *See, e.g.*, *Perera*, 598 F. Supp. 3d at 744-46 (holding that Section 1226(c) is unconstitutional as applied to an LPR who was released from criminal custody with an ICE detainer, and who checked in with federal criminal authorities for six years during supervised release prior to ICE detention); *Pham v. Becerra*, 717 F. Supp. 3d 877, 880, 884-87 (N.D. Cal. 2024) (holding that Section 1226(c) is unconstitutional as applied to an LPR who applied for naturalization and disclosed his criminal record, but ICE did not detain until one year and a half after his application). One district court found otherwise, but in the context of an LPR convicted of an aggravated felony controlled substances trafficking offense. *Rocha v. Barr*, 422 F. Supp. 3d 472, 477-80 (D.N.H. 2019). But unlike Mr. Huynh's case, that case did not involve multiple encounters with immigration authorities during the time lapse between his release from criminal custody and his ICE detention. *See id.*; *see* Decl. ¶¶ 2, 14, 15, 16 (describing Mr. Huynh's naturalization application, LPR card renewal, and travel in and out of the United States, all of which brought him to the attention of the immigration authorities, who did not seek to mandatorily detain him). Nor does Mr. Huynh's case involve a conviction for an aggravated felony, a category of crimes that Congress deemed would justify a categorical presumption of flight risk due to the lack of relief available. *See Castañeda v. Souza*, 810 F.3d 15, 61 (1st Cir. 2015) (Kayatta, J.) ("It seems to us that Congress could have—and did—reasonably regard this group of aliens as categorically posing a flight risk because their commission of the designated crimes makes it highly likely that they will be deported if ICE comes knocking."). Mr. Huynh's case also involves a non-violent theft offense,

14

instead of a conviction for trafficking in controlled substances, which the Attorney General has elsewhere found to be a presumptively dangerous crime. *See In re Y-L-*, 23 I. & N. Dec. 270, 274-77 (A.G. 2002) (reasoning that a drug trafficking aggravated felony is presumptively a *per se* "particularly serious crime" due to its inherent dangers). Read together, these cases suggest that the government's unreasonable delay in seeking removal renders mandatory detention unconstitutional as-applied to LPRs like Mr. Huynh.

Similarly, district courts have read Section 1226(c) to be constitutional only where ICE detains a noncitizen shortly after their release from the criminal custody that triggered the mandatory detention to avoid an unconstitutional reading of the statute.[4] *See, e.g., Rodriguez v. Shanahan*, 84 F. Supp. 3d 251, 264-66 (S.D.N.Y. 2015); *Araujo-Cortes v. Shanahan*, 35 F. Supp. 3d 533, 549-50 (S.D.N.Y 2014); *Martinez-Done v. McConnell*, 56 F. Supp. 3d 535, 547-48 (S.D.N.Y. 2014); *Nabi v. Terry*, 934 F. Supp. 2d 1245, 1248 (D.N.M. 2012); *Monestime v. Reilly*, 704 F. Supp. 2d 453, 458 (S.D.N.Y. 2010); *Figueroa v. Aviles*, No. 14 Civ. 9360, 2015 WL 464168, at *4 (S.D.N.Y. Jan. 29, 2015); *Espinoza v. Aitken*, No. 5:13-cv-00512, 2013 WL 1087492, at *7-8 (N.D. Cal. Mar. 13, 2013). *Accord Castañeda*, 810 F.3d at 23-44 (Barron, J.) (equally divided *en banc* court affirming the lower court's decision holding that Section 1226(c), by its plain language, structure, and purpose, authorizes mandatory detention only of those whom immigration authorities detain at the time of their release from criminal custody); *but see Castañeda*, 810 F.3d at 45-58 (Kayatta, J.) (equally divided *en banc* court holding that Section 1226(c) imposes mandatory detention regardless of when the immigration authorities take the individual into custody).

Ultimately, blanket mandatory detention irrespective of an LPR's individual circumstances—particularly where the LPR has long-standing community ties and no

---

[4] These district court cases preceded the Supreme Court's opposite interpretation of 8 U.S.C. § 1226(c). *See Nielson v. Preap*, 586 U.S. 392 (2019). There, the Supreme Court left open the question of whether Section 1226(c), as applied, was unconstitutional due to the time lapse between the criminal court's release and ICE's detention. *See id.* at 420.

aggravated-felony convictions, and the government has waited nearly twenty years to initiate removal proceedings—cannot be consistent with due process. As the First Circuit has written concerning Section 1226(c), "it is counter-intuitive to say that aliens with potentially longstanding community ties are, as a class, poor bail risks." *Saysana v. Gillen*, 590 F.3d 7, 17-18 (1st Cir. 2009). Judge Barron expressed similar sentiments in *Castañeda* about mandatory detention under Section 1226(c), writing that "the experience of having one's liberty stripped away is drastically different from the experience of not having it restored." *Castañeda*, 810 F.3d at 21. The mandatory detention after lengthy delay here against Mr. Huynh is therefore unconstitutional.

**IV.    No exhaustion requirement bars Mr. Huynh from obtaining relief in this Court.**

The government does not argue that Mr. Huynh has failed to exhaust administrative remedies. To the extent that the government suggests Mr. Huynh should have applied for parole, *see* Gov't Opp. at 11, that is an unnecessary additional step prior to this court deciding his habeas petition for five reasons.

First, the habeas statute does not require exhaustion of administrative remedies. *Flores-Powell v. Chadbourne*, 677 F. Supp. 2d 455, 463 (D. Mass. 2010) ("As the parties acknowledge, there is no statutory requirement of exhaustion in this circumstance …. Although exhaustion of administrative remedies is absolutely required if explicitly mandated by Congress, courts have more latitude in dealing with exhaustion questions when Congress has remained silent.") (quoting *Portela–Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 77 (1st Cir. 1997)).

Second, to be clear, there is no process to pursue parole in the immigration court, nor does the regulation governing parole require an affirmative application by the noncitizen. *See* 8 C.F.R. § 212.5. The government may decide to parole a noncitizen at any time. Here, the government refused to parole Mr. Huynh when it decided to send Mr. Huynh to the Plymouth County Correctional Facility rather than simply serving him with a Notice to Appear and releasing him at

Logan Airport, which it assuredly had the power to do. The government could parole Mr. Huynh to resolve this case even now, especially given his strong family ties, his important, life-saving work, and the fact that the government has never sought to deport him for these twenty-year-old misdemeanors charged when Mr. Huynh was only 17 years old despite the multiple opportunities when Mr. Huynh brought himself before the immigration authorities. *See* 8 C.F.R. § 212.5(b) (ICE may grant parole if there is no security risk nor a risk of absconding, and continued detention is not otherwise in the public interest).

Third, a request for parole directly to the agency would be futile. Courts have recognized a futility exception to common law exhaustion principles. *Sengkeo v. Horgan*, 670 F. Supp. 2d 116, 122 (D. Mass. 2009) (noting that "[c]hief among [the prudential exhaustion requirement] exceptions, for purposes of this case, is futility"). The government suggests that Mr. Huynh should ask for parole before this Court decides his petition, but the government does not acknowledge that it has discretion to parole Mr. Huyhn and it already decided not to do so when it placed him in a high-risk immigration detention unit at the Plymouth County Correctional Facility. Moreover, while the government says Mr. Huyhn can ask for parole, it also claims in the same breath that Mr. Huyhn is subject to mandatory detention thus implying that it would not release Mr. Huyhn. Regardless, under current policy, ICE is not granting parole applications; it is detaining and deporting noncitizens regardless of their individual circumstances. *See* Freidel Decl. ¶ 11. Thus, any parole request by Mr. Huynh will be futile.

Fourth, Mr. Huynh need not prudentially exhaust his administrative remedies because he alleges a violation of the Fifth Amendment of the U.S. Constitution, a claim that the immigration court cannot adjudicate. *See Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 12 (1st Cir. 2007) ("[C]ourts have demonstrated a particular hostility toward requiring exhaustion when adequate relief could not feasibly be obtained through the prescribed

17

administrative proceedings."); *Flores-Powell*, 677 F. Supp. 2d at 463 (acknowledging that "exhaustion is excused by the BIA's lack of authority to adjudicate constitutional questions"); *In re C-*, 20 I. & N. Dec. 529, 532 (B.I.A. 1992) ("[I]t is settled that the immigration judge and [the BIA] lack jurisdiction to rule upon the constitutionality of the Act and the regulations."). Seeking parole before an ICE enforcement officer does not satisfy his due-process rights to a hearing about whether continued detention during his removal proceedings is necessary. As the Supreme Court held in *Zadvydas*, an immigration detention statute raises serious due process concerns where the "sole procedural protections available to the alien are found in administrative proceedings, where the alien bears the burden of proving he is not dangerous, without significant later judicial review." 533 U.S. at 692. The Supreme Court further stated that "the Constitution may well preclude granting 'an administrative body the unreviewable authority to make determinations implicating fundamental rights.'" *Id.* (quoting *Superintendent, Mass. Corr. Inst. at Walpole v. Hill*, 472 U.S. 445, 450 (1985)); *see also Ngo v. INS*, 192 F.3d 390, 398 (3d Cir. 1999) ("Due process is not satisfied … by rubberstamp [detention decisions] based on temporally distant offenses," but "requires an opportunity for evaluation of the individual's current threat to the community and his risk of flight"); *Ricketts*, 2016 U.S. Dist. LEXIS 174751, at *10 (reasoning that availability of parole does not satisfy due process for returning LPR charged under Section 1225(b) because "parole is a discretionary decision made within the Department of Homeland Security without the review by an immigration judge or federal court"); *Arias*, 2016 WL 3906738, at *10 (same, adding that "[t]his lack of review has proven especially problematic when immigration officers have denied parole based on blatant errors").

      Finally, because Mr. Huynh challenges an ongoing deprivation of liberty, he qualifies for the irreparable harm exception to exhaustion. *See Flores-Powell*, 677 F. Supp. at 463 (acknowledging an exception to the prudential exhaustion requirement where "a particular

18

plaintiff may suffer irreparable harm if unable to secure immediate judicial consideration of his claim" and noting that "[a] loss of liberty may be an irreparable harm") (internal quotation omitted). He has compelling family reasons warranting his release. *See* Decl. ¶ 23 (filed under seal) His work involves making lung-cancer medication for individual patients, and his talents and contributions are going to waste as he sits in a jail cell. Demanding that he remain imprisoned at Plymouth while ICE considers his parole application will cause irreparable harm to him, his family, and the individuals with lung cancer who need his scientific contributions.

V.   **This Court should hold a bail hearing to release Mr. Huynh while this matter is pending.**

To the extent the Court desires time to consider Mr. Huynh's petition, it has the power to order his release while this matter is pending. When a habeas petitioner challenges a criminal sentence, bail is permissible in limited circumstances. *See Glynn v. Donnelly*, 470 F.2d 95, 98 (1st Cir. 1972). However, habeas corpus "is, at its core, an equitable remedy." *See Schlup v. Delo*, 513 U.S. 298, 319 (1995); *see also* 28 U.S.C. § 1651 (All Writs Act); 28 U.S.C. § 2243 (court shall dispose of matter "as law and justice require"). "[H]istorically, 'common-law habeas corpus was, above all, an adaptable remedy' in which the 'court's role was most extensive in cases of pretrial and noncriminal detention.'" *Flores-Powell v. Chadbourne*, 677 F. Supp. 2d 455, 474 (D. Mass. 2010) (quoting *Boumediene v. Bush*, 553 U.S. 723, 779 (2008)). Thus for civil-immigration detention, "a court considering a habeas petitioner's fitness for bail must inquire into whether the habeas petition raises substantial claims and whether extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." *Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2001) (cleaned up); *see Savino v. Souza*, 453 F. Supp. 3d 441, 453-54 & n.11 (D. Mass. 2020).

Here, the circumstances would certainly justify a release on bail pending resolution of the petition, on conditions that the Court deems just and proper. As described above, the claim here certainly qualifies as "substantial," and the circumstances are extraordinary. The government

19

does not contend that Mr. Huynh is a flight risk or a danger, or that his detention without even a bail hearing advances any government interest. *See D'Allessandro v. Mukasey*, No. 08-CV-914, 2009 WL 799957, at *3 (W.D.N.Y. Mar. 25, 2009) (lack of flight risk and danger indicative of extraordinary circumstances). And every day that Mr. Huynh is in jail is not only a day when he has lost his freedom and access to his two U.S. citizen children, *see Flores-Powell*, 677 F. Supp. 2d at 463 ("A loss of liberty may be an irreparable harm."), but is also a day when cancer patients are deprived of his work manufacturing individualized medications that might save their life. He should be released.

## CONCLUSION

For these reasons, Mr. Huynh respectfully requests that the Court deny the Respondents' request to dismiss his petition for a writ of habeas corpus, and order Mr. Huynh's release on such conditions it deems proper, or alternatively order him to be released unless the immigration court conducts a bond hearing with appropriate procedural protections for Mr. Huyhn's constitutional right against the unjustified and arbitrary deprivation of his liberty.

Respectfully submitted,

Date: April 16, 2025

/s/Jin-Ho King
Jin-Ho King #679528 (jk@clearsky.legal)
CLEAR SKY LEGAL PC
28 State Street, Suite 802
Boston, Massachusetts 02109
Tel. (857) 382-7450 x802

Mary Holper #601088 (holper@bc.edu)
BC Legal Services LAB Immigration Clinic
885 Centre Street
Newton, MA 02459
Tel. (617) 552-4573

*Counsel for Petitioner*